IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CASE NO: 3:05-cr-172-WHA |
| | ) | |
| CAMION Q. HUGULEY | ) | |

**Exhibit A to Sentencing Options Memorandum**

Olson, Jodi K., "The Waiver of Juveniles to Criminal Court: Judicial Discretion and Racial Disparity," Masters student, Department of Criminal Justice, University of Nevada - Las Vegas, Fall 2004

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Terry F. Moorer, Assistant United States Attorney, One Court Square, Suite 201, Montgomery, Alabama 36104; and I will provide a copy of same to Terrence Marshall, U.S. Probation Officer, 136 Catoma Street, Montgomery, Alabama.

s/Christine A. Freeman
**CHRISTINE A. FREEMAN**
**TN BAR NO.: 11892**
Attorney for Camion Q. Huguley
Federal Defenders
Middle District of Alabama
201 Monroe Street , Suite 407
Montgomery, AL 36104
TEL:   (334) 834-2099
FAX:   (334) 834-0353
E-Mail: Christine_Freeman@fd.org

# The Waiver of Juveniles to Criminal Court: Judicial Discretion and Racial Disparity

Jodi K. Olson*

* Jodi K Olson just completed her masters degree in the Department of Criminal Justice, University of Nevada-Las Vegas. This paper was submitted as partial fulfillment for the requirements of a graduate seminar on Juvenile Justice during the fall semester, 2004.

## Abstract

The existence of racial disparity in the waiver of juvenile cases to adult criminal court has been acknowledged in past research. In addition, questionable practices with respect to prosecutorial decision-making in the waiver process have also drawn attention to existing juvenile waiver policies. The consequences and effectiveness of waiving juveniles to criminal court also warrants further examination as current literature points toward negative experiences for youths waived to adult court and a lack of success with reference to the intended objectives of the waiver process. Upon a review of the literature, policy implications and directions for future research are discussed.

## Introduction

The purpose of the current research is to provide an informative summary of the existing literature that examines racial disparity in the transfer of juveniles to criminal court, prosecutorial discretion in the waiver process, and finally, the results of waiving juveniles to adult court. An in-depth analysis of current waiver processes holds a plethora of potentially important theoretical implications. A reflection on waiver practices could result in the development of more specific guidelines that outline what types of offenders and offenses are appropriate candidates for a waiver and a specification as to the limits of prosecutorial and judicial discretion in the waiver process.

The aim of this paper is to point out that while racial disparity is evident in the process of waiving juveniles to adult court, it also exists at other points of decision in the juvenile justice system. Another aim of this paper is to provide policy implications that could help to make the juvenile justice system more equitable and to point to ways in which prosecutorial discretion could be regulated in hopes of greater consistency in the waiver process. In addition, an examination of the intended goals of waiving juveniles to adult criminal court is also important because these goals should reflect a degree of consistency with the originally intended goals for the juvenile justice system as a whole.

## A Brief History of Juvenile Justice

Before launching into a discussion of the waiver process and the important issues surrounding the waiver of juveniles to criminal court, a brief description of the goals and history of the juvenile justice system is in order. The premise underlying the creation of the juvenile justice system in America was that of helping children who were found to be delinquent by way of delivering treatment services to youths and their families (Fagan and Zimring, 2000). As criminal court action was considered to be too harsh for troubled youngsters, they were placed in the care of the juvenile court system in which ideals from the medical and social sciences were employed to help reform them rather than to punish them. Further, skills from those in the helping professions such as social workers, psychologists, and psychiatrists were enlisted to help treat and reform troubled youths, while the juvenile court judge ultimately decided how the youth could be best helped and saw that the proper help was provided to the youth (Besharov, 1974).

Under the original intent of the juvenile court, judges were to be the very center of the process in which they would decide what treatment services were most appropriate for the delinquent youths and their families and see to it that treatment was delivered. To give the judge freedom to "accept social and psychiatric evidence, to provide informal, individualized attention, freedom to fashion flexible and innovative treatment plans," a doctrine by the name

of *parens patriae* was implemented (Besharov, 1974: 2). This doctrine was also used to justify the court's jurisdiction over youth behaviors such as truancy, disobeying parents, and associating with undesirables that weren't traditionally considered illegal, but could, under this doctrine, be reprimanded to steer youths off the path to criminality (Besharov, 1974).

Presently, it has been suggested that the original goals of the juvenile justice system in America seem to have become lost in a sea of conflicting objectives, and pressure from the media, the public, and the legislature (Houston and Barton, 2005). The American juvenile justice system, which was originally characterized by the child-saving model that originated with the advent of the first juvenile court in 1899, has, in recent years undergone theoretical and procedural transformations as a result of a number of important legislative and political decisions (Ferro, 2003).

In 1966, in the case of *Kent v. United States*, the U.S. Supreme Court established a process in which to waive juveniles to adult court. This process was required to adhere to certain constitutional safeguards, which include the right to a waiver hearing (Ferro, 2003). Just one year later, in 1967, the U.S. Supreme Court decision in the case of *In re Gault* served to create a list of constitutional rights for all juveniles that were processed in the juvenile court system. These rights included the right to notice, the right to counsel, the right to cross-examination of witnesses, and the privilege against self-incrimination. This ruling established the juvenile court system on a more parallel level with the adult court system and also put limits on the level of discretion that was a characteristic of the juvenile courts under the *parens patriae* doctrine (Ferro, 2003).

In 1970, many states began to consider lowering the age of majority in criminal court proceedings so that certain juvenile criminals could be prosecuted as adults. The 1975 Supreme Court ruling in the case of *Breed v. Jones* established that a minor could be tried in either juvenile court or criminal court, but not in both courts for the same offense, which would constitute double jeopardy (Ferro, 2003). In 1977, the state of Washington passed one of the very first determinate sentencing laws that applied to juvenile offenders. This law required flat sentences that denied the option of parole to juveniles who had committed certain crimes. The 1977 case of *Schall v. Martin* resulted in a Supreme Court decision which ruled that the pretrial detention of juveniles was lawful and did not violate due process (Ferro, 2003).

The slow transition toward a more punitive juvenile justice system continued to be forged as the case of *New Jersey v. T.L.O.* established that school officials could search students without warrants and the cases of *Stanford v. Kentucky* and *Wilkins v. Missouri*, in which the Supreme Court ruled that sentencing youths who were 16 or 17 years of age to death was permissible under the Eighteenth Amendment (Ferro, 2003). The Year 1994 was a crucial year for the juvenile justice system as the number of juveniles waived to adult court reached 11,700, and the passing of the Violent Crime Control and Law Enforcement Act, which authorized the imposition of harsher sentences for certain crimes committed by gang members and authorized adult prosecution of minors 13 years of age or older who are charged with certain violent crimes (Ferro, 2003).

As of 1997, 47 U.S. states had passed laws that made their juvenile justice systems more punitive. According to Ferro, "these include broadening transfer provisions to adult court, giving courts expanded sentencing powers, modifying confidentiality laws designed to shield juvenile offenders from stigma, and increasing the role of the victim in the juvenile justice process" (2003: 110). A slow evolution toward a more punitive juvenile justice system in America has taken juvenile court to a level similar to that of the adult court system. The waiver of juveniles to adult court is no longer a unique occurrence.

**The Waiver Process**

The concept of waiving juveniles to criminal court has been surrounded by controversy for some time. According to Fagan and Zimring, "When very serious crimes by youth are a focus of public concern, laws about transfer to criminal court jurisdiction are the most likely legislative response to that concern" (2000: 2). The waiver process pushes the boundaries of juvenile justice to the limit and sparks a series of questions with ambiguous answers. One of the biggest questions involves that of the juvenile's age: is a juvenile still considered to be a child although they've been waived into the adult court? If the answer is yes, how will their childhood standing be recognized in criminal court and further, why would an individual who

is officially recognized as a child be transferred to adult court? If not, should classification as a child depend on that individual's culpability for their behavior or on other separate factors? (Fagan and Zimring, 2000)

According to Feld (1987), the traditional purpose behind the judicial waiver was to allow a degree of individualization in the decision of whether or not a particular youth was capable of being rehabilitated in the juvenile justice system. This decision is known as the amenability decision. The judicial waiver process also provides a safety valve for the juvenile justice system in that it allows the juvenile system to eliminate those youths who commit crimes that are thought to need the imposition of certain sanctions that are beyond the scope of the juvenile system to provide (Dawson, 1992). Further, Dawson proposes that "some form of judicial waiver – or a substitute safety valve – is necessary in order to preserve the juvenile justice system politically within the context of modern penological expectations" (2000: 45).

Two major elements that weigh heavily on the decision to transfer a youth to criminal court are the availability of treatment services in and out of the courtroom, with specific attention to the juvenile justice system's ability to treat the youth in questions and also the issue of community interest and pressure from the public, with specific attention to the essentials of public safety (Besharov, 1974). Since the main issue at hand in the consideration of a waiver to adult court is the juvenile's amenability to treatment, a record of any past treatment that the juvenile has undergone is often a deciding factor. Any incidents of criminal behavior occurring subsequent to treatment attempts may indicate to the juvenile court that treatment attempts may not be useful for the youth in question. However, a clean record may help to convince the court that the juvenile's lack of prior involvement in crime should afford them a chance at rehabilitation before transferring them to adult court (Besharov, 1974).

While it is doesn't seem to be uniformly applied, there does exist a set of procedures that are supposed to be followed when a youth is transferred to the criminal justice system. These seven principles on practice were outlined in a 2001 report created by a task force assembled by the American Bar Association's criminal justice section and its juvenile justice committee. This task force was created in response to the growing number of juveniles being transferred to criminal court. The report is titled *Youth in the Criminal Justice System: Guidelines for Policymakers and Practitioners* and is primarily focused on seven main principles that should be observed as a youth is transferred to adult court (Ferro, 2003). The first principle addresses one of the essential concerns in the transfer process as it states that "youth are developmentally different from adults, and these developmental differences must be taken into account at all stages and in all aspects of the adult criminal justice system" (Ferro, 2003: 94).

The next three principles pertain to the incarceration of the youth being transferred. The guidelines suggest that any decisions regarding the pretrial release or detention of the youth awaiting trial in adult court should be reflective of their unique situation and characteristics. Further, if the youth is detained or incarcerated, a youth in the adult criminal justice system should be housed in a facility that is separate from adult institutions at least until they reach their 18th birthday. Lastly, with respect to incarceration, youth that are detained in the adult system should be appropriately provided with the programs that meet their educational, treatment, health, mental health, and vocational needs (Ferro, 2003).

When addressing the issue of counsel, the report states that "the right to counsel in the adult criminal justice system should not be waived by a youth without consultation with a lawyer and without a full inquiry into the youth's comprehension of the right and capacity to make the choice intelligently, voluntarily, and understandably. If the right to counsel is voluntarily waived, standby counsel should always be appointed" (Ferro, 2003: 95). In addition, it is stated that during the sentencing process, judges in the adult criminal justice system should consider the individual characteristics of the youth. An finally, the report says that the "collateral consequences" that would normally apply to protocol and procedure in the adult criminal justice process do not necessarily apply to all youths for crimes that have been committed before they reached the age of 18 (Ferro, 2003: 95).

**Levels of Discretion**

This section of the paper will discuss judicial and prosecutorial discretion in the waiver process with respect to the different types of waivers. Houston and Barton (2005) describe three main categories of waivers to the adult system. Among these categories are five separate types of

waivers. The first category, known as *judicial waivers*, "refer to those cases falling within the specified criteria of the court (typically age of the offender, offense category, previous record, or some combination of the three), that the judge considers in deciding to transfer the offender to the adult court system" (Houston and Barton, 2005: 361). The three types of judicial waivers are *discretionary, presumptive, and mandatory*. With discretionary waivers, judges have the discretion to waive the case to the adult system. In the case of presumptive waivers, the juvenile assumes the burden of proof to demonstrate why he or she should not be transferred to adult criminal court. Mandatory waivers apply to situations in which cases that meet particular age, offense, or other criteria are initiated in juvenile court but are transferred to adult court because they meet certain criteria (Houston and Barton, 2005).

The second waiver category includes the *direct file waiver*. Direct file waivers are sometimes referred to as the prosecutorial waiver because the prosecutor is the one that is responsible for deciding whether the particular case should be tried in juvenile court or waived to adult court (Houston and Barton, 2005). Lastly, there is the category of *statutory exclusion waivers*. This type of waiver is similar to the mandatory waiver with the exception that the prosecutor makes the decision to file the case directly in the adult court system (Griffin, Torbet, and Szymanski, 1998).

Judges have the most discretion in the discretionary waiver, whereas in the direct file waiver (aka the prosecutorial waiver) the prosecutor decides whether the case should be processed in the juvenile or adult court system. "While some prosecutorial waiver statues include clear and restrictive criteria for their application, others provide only vague guidelines" (Bishop et al, 1989: 181). Discretionary waivers are used most frequently used type of waiver within the judicial system. According to Griffin, Torbet, and Szymanski (1998), forty-six states employ the use of some type of discretionary waiver.

Arguably, one of the more controversial methods of transferring youths to adult criminal court is through the use of the direct file, or prosecutorial waiver. According to Griffin et al (1998), fifteen states now employ the use of the direct file waiver. This practice has received particular attention in the state of Florida due to the almost unlimited amount of discretion the law allows prosecutors in deciding whether or not to transfer cases to adult criminal court (Bishop, Frazier, and Henretta, 1989). Bishop et al (1989) conducted a study in which they examined juvenile transfer data from two Florida counties and also conducted interviews with prosecutors from each of Florida's twenty judicial circuits. This study found a lack of statutory guidelines governing the transfer process of cases, that waiver was easily accomplished, and that the prosecutors generally displayed a lack of support for traditional juvenile justice principles.

Similar research done by Schiraldi and Ziedenberg (1999) examines the damaging and unforeseen consequences of high levels of prosecutorial discretion in Florida's juvenile courts. Many of the consequences of increased prosecutorial discretion in the transfer process in Florida outlined in this report parallel the findings in the aforementioned research done by Bishop et al (1989). However, Schiraldi and Ziedenberg (1999) illustrate the impact of prosecutorial discretion in Florida through the use of some powerful statistics. According to their report, "the most striking feature of Florida's transferred youth population profile is the extent to which minority youth are overrepresented in the ranks of the youth being referred to adult court" (Schiraldi and Ziedenberg, 1999: 2). A study conducted by the Florida Department of Juvenile Justice (1996) concluded that black youths were 2.3 times more likely than their white counterparts to being transferred to adult court in the state of Florida.

Further, another study pointed out that although non-white youths account for just 24% of the population of 10-17 year-olds in Florida, they currently represent 74% of that population of 10-17 year-olds being held in the Florida prison system (Florida Department of Corrections, 1998). Although the practice of waiving juveniles to adult court in Florida has received attention due to its unique circumstances and it should be looked upon as an extreme case, racial disparity is evident throughout other areas of the juvenile justice system and it plagues the waiver process in other states as well (Males and Macallair, 2000; Snyder et al, 2000; Poe-Yamagata & Jones, 2000; Pope and Feyerherm, 1995).

### Racial Disparity

It is important to first establish evidence that acknowledges a general presence of racial disparity within the juvenile justice system. A literature review conducted by Pope and

Feyerherm, revealed that "most of the literature suggests both direct and indirect race effects or mixed pattern - racial effects are present at some stages and not others" (1995: 2). In addition, they found that when racial bias does exist, it can occur at any stage of juvenile processing. Pope and Feyerherm (1995) propose an analytic model that divides juvenile processing into five segments: 1) a decision to arrest or an order to appear in court, 2) an intake decision to handle the case at intake or process it further, 3) decision to remove the juvenile from their residence during processing, 4) a decision to file a formal petition of delinquency or waive to adult court instead of seeking informal resolution, and 5) a decision to resolve the case through formal or informal probation or custody transfer.

The literature analysis conducted by Pope and Feyerherm (1995) suggests considerable support for the concept that direct and indirect race effects do in fact exist and operate in certain juvenile justice systems. Interestingly, the authors reveal that literature reviews conducted on the adult criminal justice system conclude that race effects are uncommon, illustrating a clear difference in the prevalence of race effects between the two systems (Pope and Feyerherm, 1995). Pope and Feyerherm (1995) point out that in some situations, "small racial differences accumulate and become more pronounced as minority youth proceed further into the juvenile justice system," (p. 3). The authors' own research analysis of data from California and Florida illustrated this very trend as differences between minority and majority groups of offenders increased as youths progressed through different decision points in the juvenile justice system (Pope and Feyerherm, 1995). While the research of Pope and Feyerherm (1995) is interested in racial disparity at any of the five main decision points discussed above, the present research is primarily concerned the occurrence of racial disparity in the waiver of youths to adult criminal court.

An analysis of juvenile adult court waivers in California from the year 1996 reveals significant signs of racial bias (Males and Macallair, 2000). For example, in 1996, whites made up 25%, Hispanics 51%, African Americans 13%, and Asians and other races 11% of Los Angeles County's population between ages 10 and 17. Data from the L.A. Probation Department reveal that Hispanic, African American, and Asian/other youth accounted for 95% of cases in which youth were found to be unfit for juvenile court and waived to adult court. When the numbers were expressed as rates per 100,000 in the population ages 10-17 by race, it was found that Hispanics were 6 times more likely, African Americans were 12 times more likely, and Asians/other races were 3 times more likely than white youth to be waived to adult court (Males and Macallair, 2000).

A study examining the transfer of juveniles to adult court in South Carolina from 1985-1994 indicated that the "vast majority of waiver requests involved males (95 percent), most involved blacks (80 percent), and most involved juveniles age 16 or older at the time the case was referred to family court" (Snyder et al., 2000:11). When the study examined waiver requests that were actually approved, similar results were yielded. This study did find that waiver approval was somewhat less likely for white youths than for black youths; however the difference was not statistically significant (Snyder et al., 2000).

A similar study that analyzed the waiver of juveniles to adult court in Utah from 1988-1995 focused primarily on cases that began in juvenile court in which the prosecutor requested the waiver to adult court. Upon examination of waiver requests in this study, it was found that "these juveniles were predominantly male (96 percent), most were non-Hispanic whites (57 percent), and nearly 70 percent were age 17 or older at the time the case was referred to court," (Snyder et al., 2000: 18).

A different type of study that contrasted the waiver of juveniles to adult court in two different years (1986 and 1994) in Pennsylvania was able to document the changes in the percentages of those of different races waived to adult court between the two years. In 1986, white youths comprised 38% of those waived to adult court, while blacks made up 50%, and Hispanics represented 12%. Interestingly, in 1994, white youths comprised 28% of juveniles waived to adult court, blacks made up 60%, and Hispanics made up 10%. In 1994, the number of waived juveniles had nearly doubled, going from 222 in 1986 to 408. The 1994 cohort saw a 10% decrease in the proportion of white youth waived to criminal court (Snyder et al., 2000).

Building Blocks for Youth conducted a comprehensive national study that resulted in some startling numbers. A few of the these findings include the following: 1) while half of drug cases involving white youth and youth of other races result in formal processing, 75% of drug cases involving African American youth result in formal processing. 2) African American juveniles represented 39% of drug cases requested for adult court waiver, but 63% of the actual cases that were waived to the adult system for processing, while white youths were 59% of

drug cases petitioned and 35% of the cases waived to adult court. 3) The proportion of juvenile prison admissions involving a drug offense was three times greater among African American juveniles than white juveniles. 4) Concerning youth admitted to public facilities for the first time for a drug offense, the rate of admission for African American youth was 48 times that of white youth. The rate of admission for first drug offenses for Latino youth was 13 times the rate of whites (Ziedenberg, 2001, Poe-Yamagata & Jones, 2000).

In addition to reflecting high levels of prosecutorial discretion and the prevalence of racial disparity in the juvenile justice system, the process of transferring juveniles to adult criminal court has serous consequences for those youths deemed appropriate for waiver.

**Additional Consequences of Transfers**

Since the transfer of juveniles to adult criminal court now takes place in fifteen states (Griffin et al, 1998) and the practice has become established, enough data has been collected on the practice to allow some conclusions to be made regarding its effectiveness. Research by Bishop et al (1989) points out that many of the youths being transferred to adult court in Florida are not truly dangerous. If those youths who commit violent felonies are the ones who are considered dangerous, then only 29% of the youths transferred through use of the prosecutorial waiver met the dangerousness standard. Further, Bishop et al (1989) found that the criminal justice system hadn't quite exhausted all available treatment resources on these youths before transferring them and deciding that they are not amenable to treatment. In fact, it was revealed that only 35% of the youths from the sample Bishop et al (1989) analyzed in their Florida study had previously been committed for treatment at a residential facility. Further, in 23% of the cases involving transfers, youths were waived to adult court for a first offense without ever having received any form of juvenile justice treatment programming (Bishop et al. 1989).

Not only has research on transfer decisions uncovered evidence of racial disparity, but Singer (1993) has found another interesting group of youths who seem to be over-represented in the waiver process. Singer's analysis of case processing decisions in a state that has automatic transfer provisions revealed that "juvenile offenders from single-parent households were more likely to face a grand jury indictment than juveniles from dual-parent households" (1993: 253). This study concluded that the number of parents which whom an arrested youth resides was significantly related to the decision of the prosecutor to refer a case to a grand jury (Singer, 1993). Research of this sort points out the importance of examining the effects of a variety of non-offense related determinants of legal discretion in addition to a juvenile's race and parental situation.

Perhaps one of the true measures of the effectiveness of a law is its success in deterring crime. Another study that examined the waiver process in Florida looked specifically at recidivism rates for a sample of juveniles who were transferred to adult criminal court (Bishop, Frazier, Lanza-Kaduce, and Winner, 1996). Recidivism of the transferred youths was measured in terms of rates of reoffending, seriousness of reoffending, and time to failure. When compared to a matched control group of youths who were retained in the juvenile justice system, the rates of reoffending were greater among transferred youths in every measured of recidivism that was used (Bishop et al, 1996). Those youths transferred to adult criminal court recidivated at a higher rate than their non-transfer counterparts, committing more offenses although they were incarcerated for longer periods of time. When the time at risk was controlled, the transfer group still displayed a significantly higher rate of reoffending with respect to time to failure and arrest rates. Overall, this study suggests that the process of transferring youths to adult court in the state of Florida has little deterrent value (Bishop et al, 1996).

In the year 1997, 7,400 new admissions to adult prisons involved youth under the age of 18 (Poe-Yamagata and Jones, 2000). Interestingly, the number of youths admitted to state prisons more than doubled between the years of 1985 and 1997 (Strom, 2000). It would be irresponsible to attribute statistics such as these solely to flaws in specific practices, such as the waiver of juveniles to adult court. The transfer of juveniles to adult court does result in those juveniles being punished as adults and being sent to adult prisons. Young inmates face enormous risks upon admission into adult prisons (Ziedenberg, 2001). One study found that youths in adult prison are five times more likely to be them victim of sexual assault than youths sent to a juvenile institution. This study also found that youth in adult prison are twice as likely to be beaten by staff and 50% more likely to be attacked with a weapon compared to

youth in juvenile institutions (Fagan, Forst, and Vivona, 1989). Yet another sobering study found that the suicide rate of youths in adult jails is 7.7 times as high as the rate for youth in juvenile facilities (Flaherty, 1980).

**Conclusion**

The process of transferring juveniles to adult criminal court has proven to be controversial and has been questioned with respect to its effectiveness and unintended consequences. Transferring youths to adult court is arguably a departure from the traditional aims of the juvenile justice system. A high level of prosecutorial discretion and a lack of specific criteria to guide prosecutors in their decisions make the process vulnerable to abuse and a departure from rehabilitative goals. The evidence that race and other non-offense related characteristics influences legal discretion also points toward the necessity of stricter criteria to govern the transfer process and also some sort of monitoring or regulatory supervision.

A lack of attention to the specific characteristics of youths and their unique situations further illustrates the departure of the waiver process from rehabilitative ideals. The aforementioned findings lead one to ask why the criteria spelled out by the American Bar Association specifically to guide the waiver process are not implemented. Deterrent effects of transferring youths to adult court have yet to be discovered in the literature. However, youths waived to adult court have displayed higher rates of recidivism and face a number of risks upon being sentenced to adult prison.

Further research on the effectiveness and consequences of transferring youths to adult court is certainly warranted upon an assessment of current literature. Existing research poses serious challenges to the intended goals of the process itself and illustrates how the waiver process is not immune to racial disparity and nearly unlimited levels of discretion. Subsequent research should also examine the criteria that is used to determine whether or not a youth is amenable to treatment and concern itself with developing accurate measures of dangerousness for juveniles.

**References**

American Bar Association (2001). "Youth in the Criminal Justice System: Guidelines for Policymakers and Practitioners."

Besharov, Douglas J. (1974). *Juvenile Justice Advocacy: Practice in a Unique Court*. New York: Practicing Law Institute.

Bishop, Donna M., Charles E. Frazier and John C. Henretta (1989). "Prosecutorial Waiver: Case Study of a Questionable Reform." *Crime and Delinquency* 35: 179-201.

Bishop, Donna M., Charles E. Frazier, Lonn Lanza-Kaduce, and Lawrence Winner (1996). "The Transfer of Juveniles to Criminal Court: Does it Make a Difference?" *Crime and Delinquency* 42: 171-191.

*Breed v. Jones*, 421 U.S. 519 (1975).

Dawson, Robert O. (1992). "An Empirical Study of *Kent* Style Juvenile Transfers to Criminal Court." *St. Mary's Law Journal* 23: 975.

Dawson, Robert O. (2000). "Judicial Waiver in Theory and Practice." In *The Changing Borders of Juvenile Justice*, edited by Jeffrey Fagan and Franklin E. Zimring, pp. 45-81. Chicago: University of Chicago Press.

Fagan, Jeffrey and Franklin Zimring, eds. (2000). *The Changing Borders of Juvenile Justice*. Chicago: University of Chicago Press.

Fagan, Jeffrey, Martin Forst and T Scott Vivona (1989). "Youth in Prisons and Training Schools: Perceptions and the Consequences of the Treatment Custody Dichotomy." *Juvenile and Family Court*, 2: 10.

Feld, Barry C. (1987). "The Juvenile Court Meets the Principle of the Offense: Legislative Changes in Juvenile Waiver Statutes." *Journal of Criminal Law and Criminology* 78: 471-533.

Ferro, Jeffrey (2003). *Library in a Book: Juvenile Crime*. New York: Facts on File.

Flaherty, Michael G. (1980). "An Assessment of the National Incidences of Juvenile Suicides in Adult Jails, Lockups, and Juvenile Detention Centers." University of Illinois, Urbana-Champaign.

Florida Department of Corrections (1998). "Inmate Population: Current Inmate Age." Agency Annual Report.

Florida Department of Juvenile Justice (1996). Management Report, No. 42, March 24.

Griffin, Patrick, Patricia Torbet, and Linda Szymanski (1998). *Trying Juveniles as Adults in Criminal Court: An Analysis of State Transfer Provisions*. Washington, DC: Office of Juvenile Justice and Delinquency Prevention.

Houston, James and Shannon M. Barton. (2005). *Juvenile Justice: Theory, Systems, and Organization*. New Jersey: Pearson Education.

*In re Gault*, 387 U.S. 1 (1967)

*Kent v. United States*, 383 U.S. 541 (1966).

Males, M. and D. Macallair (2000). "The Color of Justice: An Analysis of Juvenile Justice Adult Court Transfers in California." Washington, DC: Justice Policy Institute, January.

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985).

Poe-Yamagata, Eileen, and Michael A. Jones (2000). "And Justice For Some." Washington DC: National Council on Crime and Delinquency.

Pope, Carl E., and William Feyerherm (1995). "Minorities in the Juvenile Justice System: Research Summary." Washington, DC: Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice.

*Schall v. Martin*, 467 U.S. 253 (1984), 335.

Schiraldi, Vincent and Jason Ziedenberg (1999). "The Florida Experiment: An Analysis of the Impact of Granting Prosecutors Discretion to try Juveniles as Adults." Washington DC: Justice Policy Institute.

Singer, Simon I. (1993). "The Automatic Waiver of Juveniles and Substantive Justice." *Crime and Delinquency* 39: 253-261.

Snyder, H., M. Sickmund, and E. Poe-Yamagata (2000). "Juvenile Transfers to Criminal Court in the 1990's: Lessons Learned from Four Studies." Washington, DC: Office of Juvenile Justice and Delinquency Prevention, August.

*Stanford v. Kentucky, Wilkins v. Missouri*, 492 U.S. 361 (1989), 129.

Strom, K. (2001). "Profile of State Prisoners Under Age 18, 1985-1997." Washington DC: Bureau of Justice Statistics.

Ziedenberg, Jason (2001). "Drugs and Disparity: The Racial Impact of Illinois' Practice of Transferring Young Drug Offenders to Adult Court." Washington DC: Justice Policy Institute.